Nos. 17-1859 & 17-1905

# In the United States Court of Appeals for the Fourth Circuit

—————————————

JTH TAX, INC., D/B/A LIBERTY TAX SERVICE; AND SIEMPRETAX, LLC,
PLAINTIFFS-APPELLANTS

*v.*

GREGORY AIME; WOLF VENTURES, INC., D/B/A WOLF ENTERPRISES;
AIME CONSULTING, LLC; AND AIME CONSULTING, INC.,
DEFENDANTS-APPELLEES

—————————————

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(CIV. NO. 16-279) (THE HONORABLE HENRY COKE MORGAN, JR.)*

—————————————

**BRIEF OF PLAINTIFFS-APPELLANTS**

—————————————

ALLISON J. RUSHING
BRADLEY D. MASTERS
WILLIAMS & CONNOLLY LLP
*725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000
arushing@wc.com*

## CORPORATE DISCLOSURE STATEMENT

Appellants are JTH Tax, Inc., d/b/a Liberty Tax Service; and SiempreTax, LLC.  Liberty Tax, Inc., a publicly held corporation, is the parent of both appellants and owns 10% or more of their ownership interests.  Appellants are not aware of any other publicly held entity that has a direct financial interest in the outcome of this litigation.

# TABLE OF CONTENTS

Page

Statement of jurisdiction ............................................................... 1

Statement of the issues ................................................................. 1

Statement of the case ................................................................... 2

    A.    Background ............................................................. 4

    B.    The evidence at trial .............................................. 6

        1.    Aime loses his EFINs and the parties enter the PSA ........ 6

        2.    Liberty allegedly offers to extend the repurchase option deadline in the PSA ....................................... 9

        3.    The relationship deteriorates ................................. 12

    C.    The district court's findings and conclusions ................................ 13

Summary of argument .................................................................. 16

Standard of review ...................................................................... 18

Argument .................................................................................. 19

I.    The district court erred by concluding that the parties formed a valid contract to extend the time to exercise the PSA's repurchase option .................................................................. 19

    A.    Aime did not objectively manifest clear and unequivocal acceptance .............................................. 21

    B.    The repurchase extension lacked consideration ............................ 26

        1.    There was no bargained-for consideration ......................... 27

        2.    Aime did not promise anything that qualifies as valid consideration .................................................. 30

        3.    The repurchase option and extension were illusory ........... 35

    C.    The repurchase option extension was not in writing as required by Virginia's statute of frauds ......................................... 37

        1.    Modifications of contracts covered by the statute of frauds must be in writing ....................................... 38

Page

Table of contents—continued:

  2.   Aime did not establish the elements of equitable estoppel ................................................................... 40

II.  The district court abused its discretion by excluding evidence about Liberty's sales and approval process ............................................ 45

Conclusion ................................................................................ 52

## TABLE OF AUTHORITIES

### CASES

*Adams* v. *Doughtie*, 63 Va. Cir. 505 (2003) .................................. 21, 26

*Addington* v. *Texas*, 441 U.S. 418 (1979) .................................. 20

*Albanese* v. *WCI Cmtys., Inc.*,
    530 F. Supp. 2d 752 (E.D. Va. 2007) .................................. 44

*Albright* v. *Burke & Herbert Bank & Tr. Co.*,
    457 S.E.2d 776 (Va. 1995) .................................. 32

*Bloomberg-Michael Furniture Co.* v. *Coppes Bros. & Zook*,
    126 S.E. 59 (Va. 1925) .................................. 24

*Boykins Narrow Fabrics Corp.* v. *Weldon Roofing & Sheet Metal, Inc.*, 266 S.E.2d 887 (Va. 1980) .................................. 41

*Bresler* v. *Wilmington Tr. Co.*, 855 F.3d 178 (4th Cir. 2017) .................................. 47

*Busman* v. *Beeren & Barry Invs., LLC*, 69 Va. Cir. 375 (2005) .................................. 31

*C.G. Blake Co.* v. *W.R. Smith & Son, Ltd.*, 133 S.E. 685 (Va. 1926) .................................. 31

*Cady* v. *Straus*, 34 S.E. 615 (Va. 1899) .................................. 36

*Cell-Crete Corp.* v. *Lexington Ins.*, No. 14-0503,
    2015 WL 12644565 (C.D. Cal. Feb. 5, 2015) .................................. 40

Page

Cases—continued:

*Colonial Ford Truck Sales, Inc.* v. *Schneider,*
325 S.E.2d 91 (Va. 1985)..................................................................40

*Commonwealth* v. *Stewart,* 66 Va. Cir. 135 (2004)..................................21, 22, 26

*Cummins* v. *Beavers,* 48 S.E. 891 (Va. 1904)..................................................30, 32

*Datastaff Tech. Grp., Inc.* v. *Centex Constr. Co.,*
528 F. Supp. 2d 587 (E.D. Va. 2007) ................................................42

*Dollar Rent A Car Sys., Inc.* v. *P.R.P. Enters., Inc.,*
No. 01-cv-698, 2006 WL 1266515 (N.D. Okla. May 8, 2006) ........................33

*ESCgov, Inc.* v. *BMC Software, Inc.,* No. 13-cv-1344,
2014 WL 3891660 (E.D. Va. Aug. 7, 2014),
*aff'd,* 597 Fed. App. 181 (4th Cir. 2015)..............................28, 31, 35

*Gitter* v. *Cardiac & Thoracic Surgical Assocs., Ltd.,*
419 Fed. App. 365 (4th Cir. 2011)....................................................41

*Greenberg* v. *Morris,* 436 S.W.2d 734 (Mo. 1968).............................................29

*Greenwood Assocs., Inc.* v. *Crestar Bank,*
448 S.E.2d 399 (Va. 1994)................................................................27

*GSHH-Richmond, Inc.* v. *Imperial Assocs.,*
480 S.E.2d 482 (Va. 1997)..........................................................27, 30

*Hunters Adm'rs* v. *Jett,* 25 Va. 104 (1826) ........................................................30

*IBM Corp.* v. *Johnson,* 629 F. Supp. 2d 321 (S.D.N.Y. 2009)...........................22

*iCore Networks, Inc.* v. *Alliance, Inc.,* No. 12-cv-535,
2012 WL 3071141 (E.D. Va. July 26, 2012) ....................................37

*Johnson* v. *Allison,* No. 03-428,
2004 WL 2266796 (Tenn. Ct. App. Oct. 7, 2004)..............................41

iii

Page

Cases—continued:

*Khoury* v. *Cmty. Mem'l Hosp., Inc.*, 123 S.E.2d 533 (Va. 1962) ...................42

*Lake Ridge Apartments, LLC* v. *Bir Lakeridge, LLC*,
  335 Fed. App. 278 (4th Cir. 2009)..................................................19

*Land & Marine Remediation, Inc.* v. *BASF Corp.*,
  No. 11-cv-239, 2012 WL 2415552 (E.D. Va. June 26, 2012)........................38

*Lindsay* v. *McEnearney Assocs., Inc.*, 531 S.E.2d 573 (Va. 2000) ............38, 39

*McKown* v. *N. Am. Dev.*, No. LS-2336-2,
  1991 WL 834897 (Va. Cir. Ct. Apr. 2, 1991) ....................................39

*McLamb* v. *T.P. Inc.*, 619 S.E.2d 577 (N.C. Ct. App. 2005)...........................31

*McLellan* v. *Charly*, 758 N.W.2d 94 (Wis. Ct. App. 2008) ...............................32

*MDDC, LLC* v. *Lawrence*, 92 Va. Cir. 326 (2016)..............................................26

*Meriweather Mowing Serv., Inc.* v. *St. Anne's-Belfield Inc.*,
  51 Va. Cir. 517 (2000).............................................................43

*Middle E. Broad. Networks, Inc.* v. *MBI Glob., LLC*,
  689 Fed. App. 155 (4th Cir. 2017).................................................48

*Multi-Med. Convalescent & Nursing Ctr. of Towson* v. *NLRB*,
  550 F.2d 974 (4th Cir. 1977).......................................................49

*Nargi* v. *CaMac Corp.*, 820 F. Supp. 253 (W.D. Va. 1992)...........................43, 44

*Nolan Bros.* v. *Century Sprinkler Corp.*,
  220 F.2d 726 (4th Cir. 1955)....................................................21, 26

*PCS Nitrogen Inc.* v. *Ashley II of Charleston LLC*,
  714 F.3d 161 (4th Cir. 2013).......................................................18

*Perini/Tompkins Joint Venture* v. *ACE Am. Ins.*,
  738 F.3d 95 (4th Cir. 2013).........................................................19

iv

Page

Cases—continued:

*Philpot* v. *Gruninger*, 81 U.S. 570 (1872).......................................29, 30

*Pierce* v. *Wells Fargo Bank*, 85 Va. Cir. 32 (2012).................................40, 43, 44

*Pizzarelle* v. *Dempsey*, 526 S.E.2d 260 (Va. 2000) ..............................20

*QinetiQ US Holdings, Inc. & Subsidiaries* v. *Comm'r*,
     845 F.3d 555 (4th Cir. 2017)....................................................18

*S. States Rack & Fixture, Inc.* v. *Sherwin-Williams Co.*,
     318 F.3d 592 (4th Cir. 2003)...................................................47

*Schultz* v. *Butcher*, 24 F.3d 626 (4th Cir. 1994)...................................50

*Schwam* v. *XO Comms., Inc.*, No. 05-1060,
     2006 WL 6884392 (4th Cir. Mar. 24, 2006)....................................20

*Seward* v. *N.Y. Life Ins.*, 152 S.E. 346 (Va. 1930)...............................35

*Smith* v. *Balt. City Police Dep't*, 840 F.3d 193 (4th Cir. 2016)........................19

*Stanley's Cafeteria, Inc.* v. *Abramson*, 306 S.E.2d 870 (Va. 1983) .................20

*Strickland* v. *Strickland*, No. 865-99-1,
     1999 WL 1133487 (Va. Ct. App. Oct. 5, 1999) ...............................19

*Sun Hotel, Inc.* v. *SummitBridge Credit Invs. III, LLC*,
     86 Va. Cir. 189 (2013)..........................................................39

*T.* v. *T.*, 224 S.E.2d 148 (Va. 1976)................................................40

*Trademark Props. Inc.* v. *A&E Television Networks*,
     422 Fed. App. 199 (4th Cir. 2011)...........................................22

*Turner* v. *Subaru of Am., Inc.*, 566 F. Supp. 143 (W.D. Va. 1983) .................27

*Wexford Bancorp, LLC* v. *Concept 1, LLC*, 66 Va. Cir. 72 (2004)....................36

Page

## STATUTES AND RULES

28 U.S.C. § 1291 ...............................................................................1

28 U.S.C. § 1332 ...............................................................................1

Fed. R. Civ. P. 26(a).....................................................................47, 48

Fed. R. Civ. P. 26(e).....................................................................47, 48

Fed. R. Civ. P. 37(c).........................................................................46

Fed. R. Civ. P. 37(c)(1) ...............................................................47, 48

Fed. R. Civ. P. 59(e).........................................................................1

Va. Code Ann. § 11-2..................................................................38, 39

## MISCELLANEOUS

I.R.S. Pub. 3112 (rev. Apr. 2017)........................................................34

Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* (4th ed. 2007) ...............................................22

## STATEMENT OF JURISDICTION

This appeal arises from a bench trial resulting in final judgment on February 15, 2017 in favor of defendants-appellees Gregory Aime; Wolf Ventures, Inc., d/b/a Wolf Enterprises; Aime Consulting, LLC; and Aime Consulting, Inc. (collectively, "Aime"). The district court had jurisdiction over this dispute pursuant to 28 U.S.C. § 1332 because the amount in controversy alleged by plaintiffs-appellants JTH Tax, Inc., d/b/a Liberty Tax Service; and SiempreTax, LLC (collectively, "Liberty") exceeded $75,000 and defendants-appellees were citizens of New York whereas plaintiffs-appellants were citizens of Virginia. Aime filed a motion to amend the judgment, *see* Fed. R. Civ. P. 59(e), which the district court denied on June 26, 2017. J.A. 878-879

Liberty filed a timely notice of appeal on July 24, 2017. J.A. 886-887. Aime filed a notice of cross-appeal on August 3, 2017, J.A. 889-890, and the Court consolidated the cases. This appeal is from a final judgment that disposes of all parties' claims and counterclaims. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.  Whether the district court erred in concluding that the parties orally modified a written option contract to extend the deadline for Aime to obtain a valid Electronic Filing Identification Number from the Internal Rev-

enue Service when the purported amendment was not (a) accepted, (b) supported by valid consideration, or (c) in writing, as required by the statute of frauds.

2.     Whether the district court abused its discretion by excluding evidence about the sales and approval process referenced in the parties' contract.

## STATEMENT OF THE CASE

This case involves a franchise dispute arising under Virginia law. Liberty, the franchisor, offers tax preparation services and related financial products. As of 2015, Aime, the franchisee, operated nine Liberty franchises and a central processing center in the greater New York City area. At the beginning of the 2016 tax season, the Internal Revenue Service ("IRS") revoked Aime's ability to file electronic tax returns after finding that he had submitted fraudulent returns. To prevent immediate loss, Liberty exercised its right to purchase and operate Aime's franchises and entered into a Purchase and Sale Agreement ("PSA") with Aime. But, in the PSA, Liberty also offered Aime the option to repurchase the franchises, subject to Liberty's approval, if he could restore his IRS filing privileges by May 8, 2016.

The parties' relationship deteriorated, and on June 9, 2016, Liberty sued Aime in the Eastern District of Virginia for breach of the PSA and related claims. *See* Dkt. 1; J.A. 23. Aime responded by locking Liberty out of its

2

stores. On July 29, 2016, the district court adopted the magistrate judge's recommendation to grant a temporary restraining order and preliminary injunction enjoining Aime from using Liberty's trademarks and property. *See* J.A. 48-69. On September 9, 2016, Aime answered the complaint and filed counterclaims alleging, *inter alia*, that Liberty had orally extended the time in which Aime could exercise the option to repurchase the franchises until December 31, 2016, and that Liberty therefore breached the PSA by suing Aime before performance of various PSA obligations was required. *See* J.A. 86.

The district court held a three-day bench trial in January 2017.[1] The court denied all of Liberty's claims, granted Aime's claims for breach of contract and the duty of good faith and fair dealing, and awarded Aime $2.7 million in damages. In particular, the court concluded that the parties formed a binding oral contract extending the time for Aime to restore his IRS filing privileges and exercise the repurchase option in the PSA. But Liberty's alleged extension offer was unilateral and, in Aime's words, "gracious." It was not accepted or supported by consideration, and it did not satisfy the statute of frauds. Liberty therefore retained the right to revoke its offer, and the district court erred in holding otherwise. The district court also erred in excluding

---

[1] The parties filed motions to dismiss and motions for summary judgment, but the district court never ruled on them.

relevant evidence about the terms of the PSA. The district court's judgment should be vacated.

## A.    Background

Liberty offers tax preparation services at franchise locations across the country. As in other franchise businesses, Liberty's franchisees promise a portion of their revenue to Liberty in exchange for the right to use Liberty's brand and proven system to solicit and serve customers within their assigned region. J.A. 713-714. Franchisees obtain leases for storefronts, operate the businesses, and retain whatever post-royalty profits remain. *Id.*

Liberty's relationship with its franchisees is governed by a franchise agreement. *See* J.A. 710-733. This agreement lays out the parties' reciprocal rights and responsibilities throughout the franchise term (typically five years), as well as the franchisee's post-term obligations should the agreement terminate or expire. *Id.* Among other things, Liberty agrees to provide training, software, and operational support, and the franchisees agree to purchase equipment and supplies, procure insurance, and train their employees. J.A. 716-721.

Relevant to this appeal, franchisees are required to obtain and maintain a valid IRS electronic filing number, or EFIN. J.A. 721. The IRS requires all individuals who process tax returns electronically to obtain an EFIN so the

4

agency can efficiently monitor the activity of tax preparation service providers.  J.A. 209-210.  The franchise agreement warns that if a franchisee's "EFINs are suspended for any reason at any time," Liberty may terminate the agreement "without notice and the opportunity to cure."  J.A. 722-723.

In addition to maintaining valid EFINs, Liberty franchisees are responsible for signing and servicing property leases and utilities contracts.  J.A. 714.  Franchisees "may not sign a lease or locate an office until Liberty approves the location," but the resulting lease is contract between the franchisee and the lessor.  J.A. 717.  Liberty is not a party to the lease or utility contracts, though it reserves the right to terminate the franchise relationship if the franchisee is "more than sixty (60) days in default of any loan, lease or sublease agreement with a third party, affecting the Franchised Business."  J.A. 723.

The franchise agreement also spells out franchisees' obligations in the event the agreement "expires, is not renewed or is terminated for any reason by any party."  J.A. 724.  Franchisees agree not to compete with Liberty within 25 miles of their territory for two years after termination or expiration of the agreement.  *Id.*  They also agree not to solicit any former customers for the purpose of offering tax services for two years.  J.A. 725.  Additionally, because Liberty is not a party to the franchisees' leases or utility contracts, franchisees agree to "[a]ssign to Liberty (if Liberty elects), and upon lessor's consent, any

5

interest [the franchisee has] in any lease, sublease or any other agreement related to the Franchised Business." J.A. 724.

### B.    The Evidence At Trial

#### 1.    *Aime Loses His EFINs And The Parties Enter The PSA*

At trial, the evidence showed that Aime became a Liberty franchisee in 2012, and by 2015, he owned nine franchises. J.A. 232. Aime testified that he did not have an EFIN of his own during this time but instead operated the nine franchises under EFINs that belonged to his brother, Jeffrey. J.A. 279-280, 303. Aime had attempted to obtain his own EFINs, but the IRS had rejected his application because of his prior conviction for fraudulent misconduct. J.A. 587, 742.

In December 2015, the IRS caught Aime filing fraudulent returns and revoked the EFINs he had been using to run his franchises. J.A. 210-211. Without a valid EFIN, Aime could not operate any of his nine franchises, J.A. 213, and under the franchise agreements, Liberty had a right to terminate the relationship without notice and opportunity to cure, J.A. 722.

Aime informed Liberty of this troubling development in January 2016. J.A. 209. The 2016 tax season was underway, and Liberty had nine territories that no longer had an operating franchise. Rather than end the franchise relationship outright as it had a right to do, the evidence showed that Liberty agreed to a new arrangement with Aime that would keep him out of the stores

while his EFINs were revoked, but would also allow him a chance to regain his franchises if the IRS restored his EFINs within a specified period. J.A. 704.

This new arrangement was memorialized in the Purchase and Sale Agreement ("PSA"). J.A. 703. Liberty agreed to buy Aime's franchises for just over $1 million, *id.*, an amount roughly equivalent to Aime's outstanding debt to Liberty, J.A. 815. Aime's former employees were put on Liberty's payroll, and Liberty assumed responsibility for operation of the franchises, including for any expenses "arising out [of] or related to [Liberty's] operation of the Business from the moment of Closing and thereafter." J.A. 703. Aime agreed, among other things, to "relinquish all interests in the Business" and to facilitate the transfer of customer information to Liberty. J.A. 705. The PSA terminated the franchise agreements for the nine territories, J.A. 703, and Aime acknowledged that he was "bound by all post-termination obligations set forth in . . . the Franchise Agreements," J.A. 705.

The PSA also created a repurchase option for Aime. J.A. 704. According to the PSA, if Aime received a valid EFIN from the IRS between February 28, 2016 and May 8, 2016, he would "have the option to buy back the Business . . . pursuant to a separate purchase and sale agreement between the parties and subject to [Liberty's] standard sales and approval process." *Id.* Aime could "exercise this option by providing written notice to [Liberty] and proof

7

of EFIN before May 8, 2016 and entering into all required sales documenta-tion to effectuate the transaction." *Id.* If Aime bought the franchises back, Liberty would retain its purchase price under the PSA and would instead pay Aime the adjusted net profits, less the royalty fees and some interest, from operation of the franchises from the closing date of the PSA through the date of resale. J.A. 703-704.

The evidence showed that Aime was not bound to exercise the repur-chase option, nor did Liberty guarantee that he would regain ownership. The PSA stated that any separate purchase and sale agreement would be "subject to [Liberty's] standard sales and approval process." J.A. 704. Liberty em-ployee Angela Ianni testified that, because he was no longer a franchisee, Aime would "be treated as a new prospect," J.A. 221, and the standard approval pro-cess for new franchisees required approval "by the regional director, the VP of operations, the CFO and [the] CEO." J.A. 193. When Liberty's trial counsel probed further about this "sales and approval process" referenced in the PSA, Aime's counsel objected, arguing that the line of questioning should not be permitted because Liberty did not produce any documents about the sales and approval process in response to a discovery request. J.A. 222. In response, Liberty's counsel noted that Liberty had "submitted that there are no sales and approval documents," and that Aime had declined "the opportunity to con-duct a 30(b)(6) deposition of Liberty." *Id.* Liberty's counsel urged that Ms.

8

Ianni could "testify . . . that there are no documents," and that "if [he] had the documents, [he] would use them as exhibits." *Id.* The district court sustained Aime's objection and prevented further testimony about the sales and approval process on the ground that "no documents were ever produced." J.A. 223.

Aime testified that he signed the PSA on January 21, 2016. J.A. 265. Liberty promptly informed the franchises that Aime was "banned from the offices," J.A. 325; because the IRS had suspended his EFINs, Aime could not be involved in the business in any capacity. After signing the PSA, Aime e-mailed Liberty's CEO, John Hewitt, to "thank [him] for everything," saying that Hewitt had "saved me as well as my family." Dkt. 118-11.[2]

### 2. *Liberty Allegedly Offers To Extend The Repurchase Option Deadline In The PSA*

a.   The evidence at trial showed that on January 26, 2016, Aime and others met with Hewitt. J.A. 423. At the meeting, Aime informed Hewitt that Liberty's attempts to transfer the leases for the franchise properties to Liberty had upset his landlords. J.A. 425. Even though Liberty had the right to request (and Aime had an obligation to facilitate) assignment of those leases,

---

[2] This e-mail was not introduced into evidence at the bench trial but was put before the district court as an attachment to Liberty's reply in support of its motion for summary judgment.

9

Aime requested that Liberty leave the leases in his name for the time being, and Hewitt obliged. *Id.*

Aime also informed Hewitt that he had learned from the IRS that his EFIN account was locked until October, therefore it was highly unlikely that he would receive a valid EFIN before the May 8 repurchase deadline. *Id.* Ultimately, the evidence showed, Aime and Hewitt decided that Aime would continue his efforts to secure an EFIN, and in the meantime, his employee and friend, Sergio Jean-Louis, would also apply to the IRS for an EFIN and to Liberty to purchase the franchises. J.A. 343-344, 426.[3] If Jean-Louis received his EFINs and his application was approved by Liberty, he would purchase the franchises and would be responsible for operating them while Aime waited for the IRS to process his EFIN application. J.A. 426, 436.

Jean-Louis received EFINs from the IRS in early February. J.A. 343.[4] Before Liberty could sell the franchises to him, however, Jean-Louis's application had to pass the standard sales and approval process. J.A. 346. Among

---

[3] Initially, Hewitt and Aime expected that Marie Fletcher, another of Aime's former employees, would buy the franchises, but they later agreed Jean-Louis was a better candidate. J.A. 343-344.

[4] In a February 11 e-mail that Aime put before the district court in his motion for summary judgment (but did not introduce at trial), Aime shared with Hewitt the "great news that my partner Sergio Jean-Louis has received his Efins [sic]" and informed Hewitt: "I am ready to move forward with your blessings. Thank you for saving me and the business as a whole." J.A. 140.

10

other things, Jean-Louis had to complete a background check, the franchises had to pass an audit, and Hewitt had to approve the conveyance. J.A. 865. By April, the Jean-Louis plan began to fall apart. Two employees at Liberty's headquarters felt uncomfortable selling to Jean-Louis, and because of this development, Hewitt refused to give his approval to the sale. J.A. 436.

b.     Marie Fletcher, a former Aime employee who became a Liberty employee after the PSA, testified that she met with Hewitt on April 8 and he informed her that he would not sell to Jean-Louis. *Id.* According to Fletcher, Hewitt then, unprompted, inquired about the status of Aime's EFIN application. *Id.* Fletcher told Hewitt that "the last piece" was the IRS's suitability determination, which was expected by October 1st, after which Aime should receive EFINs within 45 days. *Id.* Fletcher testified that Hewitt responded to this report by stating, "[t]hen I'm going to extend the PSA to the end of the year." J.A. 437. As Fletcher later recounted to Jean-Louis, Hewitt "was sympathetic to the situation" and wanted to "extend the deadline for [Aime] to get his EFIN" to "make up for [not selling to Jean-Louis]." J.A. 356. Fletcher informed Aime of Hewitt's offer the next day. J.A. 437.

According to the evidence at trial, Aime contacted Hewitt about the extension offer for the first time by e-mail on April 20. J.A. 816. Aime wrote, "[I] understand that you are graciously allowing me to extend my PSA agreement until December," and he inquired about how to complete the deal, asking:

11

"What steps should I take to move forward with extending the PSA[?] Would we be able to set a face to face meeting[?]" *Id.*

By April 28, Hewitt still had not responded, and in the interim, Aime had learned some concerning news: Liberty decided to move his former staff around to handle issues at other company stores that Aime did not intend to purchase. J.A. 736. Aime e-mailed Hewitt again—10 days before the expiration of the EFIN deadline in the PSA—saying, "I do not know the intentions of [Liberty] to either take the stores back or to help [me] get the stores back." *Id.* Explaining himself, Aime referred to the recent staff movements away from his former stores, asking "At this point I would like to know will I even receive the stores or will this be bought[?]" *Id.* He acknowledged his understanding that "the company [area developer] is telling her [district manager] that I will not get the stores back and they are telling my prior staff the same." *Id.* Aime concluded the e-mail by asking Hewitt, "Would you like to switch leases over and handle a buyout or will you extend my PSA agreement and work things out with the buyback[?]" *Id.* Hewitt did not answer Aime's question. J.A. 261.

### 3. *The Relationship Deteriorates*

The evidence showed that, over the next two months, Liberty and Aime's relationship deteriorated. On June 9, Liberty filed the complaint initiating this case, alleging that Aime breached the PSA by, *inter alia*, failing to transfer

12

office equipment and retaining or removing materials and records associated with the franchises, and breached the franchise agreements by failing to adhere to the post-termination obligations. *See* Dkt. 1.

On June 17, Aime changed the lock (an electronic passcode) at the centralized processing and call center associated with his former franchises to exclude Liberty, and Liberty was effectively locked out of other locations because they did not have keys. J.A. 480-481. Liberty filed an amended complaint and sought a temporary restraining order to regain control of its stores, alleging breach of contract, trademark infringement, trademark dilution, misappropriation of trade secrets, and conversion. *See* J.A. 23-45; Dkt. 7; Dkt. 8. In an August pleading related to its successful motion for a restraining order and injunction, Liberty confirmed what was already obvious—that "even if [Aime] obtained a new EFIN today, [he] would not be invited to open [his] former franchises." Dkt. 35 at 5. Aime obtained EFINs from the IRS on September 20, 2016. J.A. 822.

## C.    The District Court's Findings And Conclusions

The district court issued its findings and conclusions on February 15, 2017. The court concluded that Liberty was the first party to breach the PSA and its breach excused Aime from performing his contractual obligations. J.A. 867. In particular, the court found that Liberty breached by failing to pay or reimburse certain operating expenses, including some rent and utilities, as

13

early as March 29, 2016, and by failing to pay the balance of the PSA purchase price on May 15, 2016 (although the court later acknowledged that the purchase price could not be included in the damages assessment because it "would never have been paid had the Business been conveyed to [Aime]"). J.A. 868-869, 873.

The court was particularly bothered by what it considered a "course of conduct" by Liberty that "did not respect or recognize Defendants' right to repurchase the Business." J.A. 869. Liberty maintained at trial that Aime did not have a *right* to repurchase the franchises but only an option to re-apply that would be subject to the same sales and approval process as any other application. The court disagreed, construing the PSA as creating a right to repurchase and treating Liberty's position as evidence of bad faith. *Id.* The court also viewed the temporary plan to attempt to sell the franchises to Jean-Louis as evidence of Liberty's bad faith, even though that plan was drawn up at Aime's insistence and to his gratitude. *Id.*; *see* J.A. 140.

Regarding the EFIN deadline in the PSA, the district court found, based on Fletcher's testimony and the fact that Hewitt did not testify at trial, that Hewitt offered to extend the option period on April 8. J.A. 870-871. The court apparently concluded that the parties thereafter entered a valid oral contract to modify the PSA, although the court did not indicate when the offer was accepted or whether it was supported by consideration. J.A. 871. Concerning

14

acceptance, the court said only that Aime's April 28 e-mail, in which he asked if Hewitt "would . . . like to switch leases over and handle a buyout or . . . extend [his] PSA agreement and work things out with the buyback," did not "affect Mr. Aime's acceptance of Mr. Hewitt's offer to extend the EFIN deadline." *Id.* The court also considered Aime's ongoing payment of rent and expenses as evidence of an extension. *Id.* Concerning consideration, although Liberty raised the issue at every stage of the litigation, the court did not address whether Aime made a promise or accepted a detriment in exchange for the extension.

The district court further held that the EFIN extension was not covered by the statute of frauds. J.A. 872. The court held that the PSA could be performed within a year, that the long-term leases it addressed were not relevant because they were not automatically transferred to Liberty, and that it was not a suretyship contract. *Id.* The court also suggested, without elaboration, that the doctrine of equitable estoppel barred Liberty from asserting the statute of frauds, because Aime had "relied upon [Liberty's] verbal promise of an EFIN extension to his detriment." *Id.*

As a result of these conclusions, the district court denied all of Liberty's claims and granted Aime's claims for breach of contract and the implied covenant of good faith and fair dealing. J.A. 873. The court entered judgment in favor of Aime in the amount of $2,736,896.17, representing future lost profits

15

and the adjusted net profits from the 2016 tax season, which the court determined that Aime would have received had he repurchased the franchises. J.A. 873, 875. The court denied Aime's request for punitive damages and attorney's fees. J.A. 875.

On March 1, Aime filed a motion to amend the judgment to include judgment on his fraud in the inducement claim and to award attorney's fees. The district court denied the motion on June 26. J.A. 878-879. This appeal followed.

## SUMMARY OF ARGUMENT

I.    Under foundational principles of Virginia contract law, a modification of a written contract is not binding unless it is accepted, bargained for, and in writing (when the contract to be modified is required to be in writing). The district court scarcely acknowledged these principles and erred in applying them to conclude that Liberty was bound by an oral offer to extend Aime's repurchase option in the PSA. The judgment should be vacated.

A.    Aime did not accept Hewitt's extension offer. Valid acceptance must be positive, unequivocal, and unqualified. Aime's communications and conduct, on which the district court relied, did not satisfy that standard. To the contrary, Aime asked what "further steps" needed to be taken to accomplish the extension and requested an in-person meeting for further discussion. When he received no response, Aime sent an e-mail indicating that he did not

16

believe a deal had been struck and asking whether Liberty would extend the repurchase option or not. The most one can say of Aime's e-mails is that they were ambiguous, but when an alleged acceptance can be read two ways, the offeror's interpretation controls.

B.    Even if the extension offer were accepted, it lacked consideration. Aime did not agree to undertake any reciprocal obligation in exchange for Hewitt's promise to extend the repurchase option. The district court entirely ignored Liberty's argument about the absence of consideration, but none of the supposed detriments that Aime has identified qualify as valid consideration. Moreover, the option and its extension were illusory for a lack of consideration from Liberty, in light of the fact that, under the PSA, Liberty was not obligated to approve Aime's repurchase application but rather held exclusive control over whether to perform.

C.    The option extension fails for the additional reason that it was not in writing. Under Virginia law, any modification to a contract covered by the statute of frauds must be in writing. The PSA was required to be in writing because it contained several two-year restrictive clauses and terminated the franchise agreements, which were covered by the statute. Any modification of the PSA, therefore, was required to be in writing. The district court, without explanation, asserted that Aime had detrimentally relied on the extension and so Liberty was equitably estopped from invoking the statute of frauds. That

17

was incorrect, as Aime's purported reliance was not reasonable and he did not undertake a detrimental change in position sufficient to impose estoppel and override the statute of frauds.

II.    The district court separately abused its discretion by excluding testimony at trial about the "sales and approval process" referenced in the PSA that Aime was required to satisfy before he could regain the franchises. The court apparently excluded the evidence as a sanction for Liberty not producing documents about the sales and approval process in discovery, despite the undisputed fact that no such documents existed. The excluded testimony concerned a condition precedent to the repurchase option, and its exclusion likely led the district court to misinterpret the option, tainting its rulings about Liberty's conduct and damages. As a result of the court's evidentiary error, the judgment should at a minimum be vacated and the case remanded for a new trial.

## STANDARD OF REVIEW

On appeal from a bench trial, this Court reviews "factual findings for clear error, legal questions de novo, and mixed questions of law and fact de novo." *QinetiQ US Holdings, Inc. & Subsidiaries* v. *Comm'r*, 845 F.3d 555, 562 (4th Cir. 2017), *petition for cert. filed*, 85 U.S.L.W. 3510 (U.S. Apr. 4, 2017) (No. 16-1197). The Court "review[s] the district court's applications of contract principles de novo." *PCS Nitrogen Inc.* v. *Ashley II of Charleston LLC*,

714 F.3d 161, 173 (4th Cir. 2013); *see also Perini/Tompkins Joint Venture* v. *ACE Am. Ins.*, 738 F.3d 95, 101 (4th Cir. 2013) ("We also review de novo a district court's decision on an issue of contract interpretation.").  A district court's evidentiary rulings are reviewed for abuse of discretion.  *Smith* v. *Balt. City Police Dep't*, 840 F.3d 193, 200 (4th Cir. 2016).

## ARGUMENT

## I.    THE DISTRICT COURT ERRED BY CONCLUDING THAT THE PARTIES FORMED A VALID CONTRACT TO EXTEND THE TIME TO EXERCISE THE PSA'S REPURCHASE OPTION

The central question before the Court is whether the parties validly modified the repurchase option in the written PSA to extend the deadline for Aime to obtain an EFIN.  Modifications to existing contracts must contain all the same elements as are required to prove any contract: offer, acceptance, consideration, and a writing (when required by the statute of frauds).  *See, e.g.*, *Strickland* v. *Strickland*, No. 865-99-1, 1999 WL 1133487, at *3 (Va. Ct. App. Oct. 5, 1999) (per curiam) (rejecting a modification that lacked the elements of a contract).

"The Virginia Supreme Court has acknowledged that contracting parties may 'modify the terms of their contract by express mutual agreement,' but there must be 'clear, unequivocal and convincing evidence' of the parties' intent to modify the contract."  *Lake Ridge Apartments, LLC* v. *BIR Lak-*

19

*eridge, LLC*, 335 Fed. App. 278, 283 (4th Cir. 2009) (per curiam) (quoting *Stanley's Cafeteria, Inc.* v. *Abramson*, 306 S.E.2d 870, 872-873 (Va. 1983)); *see Schwam* v. *XO Commc'ns, Inc.*, No. 05-1060, 2006 WL 6884392, at *4 (4th Cir. Mar. 24, 2006) (per curiam) (citing *Stanley's Cafeteria* and holding that, "in the absence of clear evidence that XO intended to modify [the contract], we are constrained to enforce the [contract's] detailed terms"). Unequivocal evidence is "free from uncertainty." *Pizzarelle* v. *Dempsey*, 526 S.E.2d 260, 264 (Va. 2000) (internal quotation marks omitted); *cf. Addington* v. *Texas*, 441 U.S. 418, 432 (1979) ("The term 'unequivocal,' taken by itself, means proof that admits of no doubt, a burden approximating, if not exceeding, that used in criminal cases." (footnote omitted)).

Aime did not carry his burden to prove the elements necessary for a valid modification of the PSA by clear, unequivocal, and convincing evidence. Accepting that Liberty CEO Hewitt offered to extend the repurchase deadline, Aime never accepted Hewitt's offer. Moreover, even if Aime's ambiguous e-mails could legally pass for acceptance, he did not make any promise or undertake any detriment that would qualify as consideration for the agreement. In addition, the alleged modification was never executed in writing and signed by the parties, as required by the statute of frauds.

### A. Aime Did Not Objectively Manifest Clear And Unequivocal Acceptance

Under settled Virginia law, "[a]n acceptance is an unconditional promise to be bound by the terms of the offer." *Adams* v. *Doughtie*, 63 Va. Cir. 505, 520 (2003). "[A]cceptance of an offer must be unequivocal and unqualified in order to bind the offerer and result in a valid contract." *Nolan Bros.* v. *Century Sprinkler Corp.*, 220 F.2d 726, 728 (4th Cir. 1955). Virginia follows "the objective theory of contract," under which acceptance occurs when "it would be clear to a reasonable person in the position of the offeror that there was an acceptance." *Commonwealth* v. *Stewart*, 66 Va. Cir. 135, 154-155 (2004). On appeal, there is no dispute about the facts regarding Aime's responses to Hewitt's offer, but only about whether those facts satisfy this legal standard.

The district court identified three bases for its conclusion that Aime accepted Hewitt's offer to extend the PSA deadline. None of those bases, alone or in combination, demonstrate unequivocal acceptance that would be clear to a reasonable person in Hewitt's position. First, the district court noted that, in his April 20 e-mail to Hewitt (12 days after the offer was communicated to Fletcher), Aime acknowledged Hewitt's offer, writing: "I . . . understand that you are graciously allowing me to extend . . . my PSA agreement until December." J.A. 816; *see* J.A. 871. But Aime did not stop there. He went on to ask "What steps should I take to move forward with extending the PSA[?] Would we be able to set a face to face meeting[?]" J.A. 816. Far from unequivocal

acceptance of Hewitt's offer, Aime's e-mail indicated that he contemplated that further discussions and actions would be necessary to iron out the details and actually reach an agreement extending the PSA.

Even if Aime had subjectively intended his April 20 e-mail to communicate acceptance, it was ambiguous. The objective test asks whether "it would be clear to a reasonable person in the position of the offeror that there was an acceptance." *Stewart*, 66 Va. Cir. at 154. When a "reasonable person could view" the offeree's communication "as assent, rejection, or an invitation to bargain further . . . it is the offeror's reaction to that ambiguous acceptance that controls whether the parties have entered into a contract." *Trademark Props. Inc.* v. *A&E Television Networks*, 422 Fed. App. 199, 204 (4th Cir. 2011) (ellipsis in original) (internal quotation marks omitted). By communicating an ambiguous acceptance "the offeree must assume the risk of the offeror's misinterpretation" as long as it "is plausible or reasonable." *Id.* at 205 (internal quotation marks omitted). This principle "makes good[ ]sense as a matter of contract law," because it "is merely a more specific iteration of the traditional principle that ambiguity is construed against the party who issued the communication—a principle that encourages parties to [a] transaction to be as clear as possible." *IBM Corp.* v. *Johnson*, 629 F. Supp. 2d 321, 331 (S.D.N.Y. 2009), *aff'd*, 355 Fed. App. 454 (2d Cir. 2009); *see also* 2 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 6:10, at 94 (4th ed. 2007)

("To the extent that either interpretation is plausible, the offeree can hardly complain if the offeror understands the communication as the offeree apparently intended . . . .").

Liberty's interpretation of Aime's ambiguous e-mail as not containing an unequivocal acceptance of the offer Hewitt expressed to Fletcher was entirely reasonable. Although he expressed interest in "mov[ing] forward with extending the PSA," Aime's question about how to do so indicated that the PSA was not already extended, i.e., the parties had not yet reached a final agreement. Aime asked follow-up questions, including a request to meet face-to-face, which is reasonably interpreted as a request for further discussions and negotiations. Liberty reasonably did not simply assume that Aime intended to unconditionally accept Hewitt's offer. After all, the offer had been expressed to Fletcher, a Liberty employee, unprompted by any request from Fletcher or Aime, and without any additional details. J.A. 435-437. Fletcher did not testify that she had ever discussed the possibility of an extension of the PSA (as opposed to Jean-Louis purchasing the franchises) with Aime before that meeting. There was no evidence at trial that either Hewitt or Fletcher knew if Aime would accept this proposal without further discussions or modifications.

Second, the district court asserted that Aime's April 28 e-mail did "not affect" his acceptance, J.A. 871, but if anything, that e-mail further confirmed

that a meeting of the minds had not yet occurred. The PSA's deadline for obtaining an EFIN was 10 days away. Aime had received no response to the questions in his prior e-mail about how to finalize an agreement to extend the PSA. In the meantime, he had learned that Liberty was taking actions arguably inconsistent with extending the option period for his eventual repurchase. J.A. 736. Noting these actions, Aime stated: "I do not know the intentions of Liberty to either take the stores back or to help [me] get the stores back." *Id.* He went on to ask, "At this point I would like to know will I even receive the stores or will this be bought[?] . . . Would you like to switch leases over and handle a buyout *or will you extend my PSA agreement* and work things out with the buyback[?]" *Id.* (emphasis added).

In other words, with his option in the written PSA about to expire, Aime asked Hewitt if he would like to wrap up Liberty's purchase of the franchises or extend the option. Those simply are not the words of someone who has already accepted an offer and entered into a binding contract with Liberty to extend the PSA agreement to December 31. Indeed, Aime's questions about whether the PSA would be extended demonstrate his own understanding that no agreement had yet been reached. At a minimum, his response would cause a reasonable person in the position of the offeror to conclude that the offer to extend had not yet been accepted and a binding contract had not been formed. *See, e.g.*, *Bloomberg-Michael Furniture Co.* v. *Coppes Bros. & Zook*, 126 S.E.

24

59, 63 (Va. 1925) (finding no acceptance where "[r]unning through the entire record is a thread of uncertainty as to the true status of the parties").

Third, the district court believed that Aime's course of conduct—paying "rent and expenses for the Business after the PSA closing and past the original May 8, 2016 EFIN deadline"—supported acceptance. That is incorrect. As an initial matter, Aime's payment of rent and expenses after the PSA closing but before the May 8 deadline bears no relation to acceptance of an *extension* of that deadline past May 8. And the fact that Aime continued to pay rent and expenses after May 8 signals nothing: he had a contractual obligation to pay his lessors and other obligees irrespective of his relationship with Liberty. J.A. 272.

More fundamentally, the district court's conclusion cannot be squared with Aime's April 28 e-mail, in which he asked Hewitt about Liberty's recent decision to transfer staff from Aime's former franchises to other stores he did not own or intend to purchase. J.A. 736. Concerned these actions meant that Liberty was preparing to part ways with Aime after his option expired in 10 days, Aime stated that "the company [area developer] is telling her [district manager] that I will not get the stores back and they are telling my prior staff the same." *Id.* Aime recognized that Liberty was not acting as though it expected to maintain a relationship with him, and Hewitt never responded to reassure Aime that Liberty's actions meant anything else. Aime may have

25

continued paying rent and expenses for the business in the hope that he and Liberty could later reach an agreement, but his communications and the context of the parties' relationship demonstrated that no agreement had yet been reached.

Whether considered in isolation or together, these three facts cannot satisfy the legal standard for acceptance that is unconditional, unequivocal, and clear to a reasonable person in Liberty's position. *See Nolan Bros.*, 220 F.2d at 728; *Adams*, 63 Va. Cir. at 520; *Stewart*, 66 Va. Cir. at 154-155. The district court erred in concluding otherwise.

## B.    The Repurchase Extension Lacked Consideration

Even if Aime accepted Hewitt's offer, no valid agreement to extend the option period in the PSA was formed because the agreement lacked consideration. Every contract requires consideration, including a contract to modify a prior agreement. *MDDC, LLC* v. *Lawrence*, 92 Va. Cir. 326, 328 (2016). The parties here did not bargain for Aime to provide any benefit to Liberty or to undertake any detriment in exchange for Liberty's promise to extend the PSA option period. None of the detriments that Aime has claimed he undertook were new obligations in exchange for the extension, therefore they cannot qualify as consideration as a matter of law. Furthermore, because the PSA

provided that Aime's repurchase was subject to Liberty's discretionary approval, the option and extension were illusory and unsupported by consideration.

Although Liberty raised the lack of legal consideration at every stage of the litigation, the district court never addressed the issue. The court's implicit holding, without any reasoning, that the contract modification was supported by consideration is legally erroneous.

### 1.    *There Was No Bargained-For Consideration*

Consideration is "the price bargained for and paid for a promise." *GSHH-Richmond, Inc.* v. *Imperial Assocs.*, 480 S.E.2d 482, 484 (Va. 1997) (internal quotation marks omitted). "It may be in the form of a benefit to the party promising or a detriment to the party to whom the promise is made." *Id.* (internal quotation marks omitted). Merely undertaking a detriment is not consideration unless the parties bargained for that undertaking. *Greenwood Assocs., Inc.* v. *Crestar Bank*, 448 S.E.2d 399, 402 (Va. 1994) ("The fact of forbearance to act does not establish consideration for the undertaking, unless there was an agreement, express or implied, that the plaintiff would forbear to act."); *see also Turner* v. *Subaru of Am., Inc.*, 566 F. Supp. 143, 148 (W.D. Va. 1983) (delivery of products "was nothing but an unbargained-for promise, unsupported by consideration"). In other words, consideration requires that the offeree agrees to undertake "a reciprocal obligation" in exchange for the

27

offeror's promise. *ESCgov, Inc.* v. *BMC Software, Inc.*, No. 13-cv-1344, 2014 WL 3891660, at *5-6 (E.D. Va. Aug. 7, 2014), *aff'd per curiam*, 597 Fed. App. 181 (4th Cir. 2015).

Aime did not bargain to pay any price, whether benefit or detriment, for Hewitt's promise to extend the PSA repurchase deadline. Before Hewitt allegedly communicated the offer to Fletcher on April 8, the parties had never discussed the idea of extending the option deadline. Even when Aime learned that the IRS likely would not restore his EFINs before May 8, neither Hewitt nor Aime raised the possibility of modifying the PSA. *See* J.A. 343-344, 424-426. The evidence at trial showed that Fletcher intended to discuss Jean-Louis's franchise application with Hewitt on April 8, not to request an extension on Aime's behalf, and no evidence suggested that Fletcher proposed any obligation on Aime's part in exchange for Hewitt's offer to extend. *See* J.A. 435-438.

Nor did Aime propose (much less the parties agree to) any reciprocal obligation in his e-mails to Hewitt concerning the EFIN extension offer. *See* J.A. 736, 816. To the contrary, Aime correctly described the extension offer as "gracious[]." J.A. 816. He did not agree with Hewitt to pay any additional money for the promise or provide some other benefit to Liberty, he did not agree with Hewitt to undertake some detriment in exchange for the promise, and he made no promise in return. *See, e.g.*, J.A. 264 (Aime acknowledging

28

that there was no agreement for him to pay additional money to Liberty for an extension of the EFIN deadline).

Likewise, Hewitt did not bargain for anything from Aime. According to Fletcher, Hewitt unilaterally stated, "I'm going to extend the PSA to the end of the year.... [D]one. Extended." J.A. 437. Hewitt did not request anything from Aime in return at that time or on any other occasion. *See id.* As Fletcher recounted to Jean-Louis, Hewitt "was sympathetic to the situation" and offered to extend the option "to make up for" his decision not to sell to Jean-Louis. J.A. 356.

Although Liberty had an interest in resolving the ownership of Aime's franchises, the law recognizes a "clear distinction" between "the motive that may induce to entering into a contract and the consideration of the contract." *Philpot* v. *Gruninger*, 81 U.S. 570, 577 (1872). "An expectation of results often leads to the formation of a contract, but neither the expectation nor the result is the cause or meritorious occasion requiring a mutual recompense in fact or in law." *Id.* (internal quotation marks omitted). As another State's high court has put it, "the motive which prompts one to enter into a contract and the consideration for the contract are distinct and different things. Parties are led into agreements by many inducements, such as the hope of profit, . . . [but] [t]hese inducements are not . . . consideration." *Greenberg* v. *Morris*, 436 S.W.2d 734, 738 (Mo. 1968) (alteration and internal quotation marks omitted);

29

*see also Hunters Adm'rs* v. *Jett*, 25 Va. 104, 112 (1826) (concluding that, while the party's action was "a motive sufficient to induce indulgence, it cannot be regarded by us as a legal consideration, sufficient to impose obligation"). Only a "bargained for" benefit or detriment can qualify as consideration. *GSHH-Richmond*, 480 S.E.2d at 484; *see Philpot*, 81 U.S. at 577 ("Nothing is consideration that is not regarded as such by both parties.").

Without such a bargain here, "there was no consideration for the verbal promise or agreement to extend the time for the exercise of the option." *Cummins* v. *Beavers*, 48 S.E. 891, 894 (Va. 1904). Without consideration, Hewitt's promise was "a mere continuing offer . . . [that] only continued until . . . withdrawn, or otherwise ended by some act of his." *Id.* Liberty withdrew the offer, at the very latest, on August 29 when it stated that "even if [Aime] obtained a new EFIN today, [he] would not be invited to open [his] former franchises." Dkt. 35 at 5. Because Liberty withdrew the extension offer before Aime received his EFINs, the original option period of the PSA remained operative.

### 2. *Aime Did Not Promise Anything That Qualifies As Valid Consideration*

In his pre-trial briefs in the district court, Aime identified a handful of actions as supposed consideration for the option extension. Putting aside the fact that the parties did not bargain for any of those actions or regard them as consideration for Hewitt's promise, none of the detriments that Aime claims to have undertaken qualify as valid consideration.

30

### a.    *Aime's Continued Efforts To Restore His EFINs*

Aime claims that he continued his efforts to obtain EFINs. Those efforts do not constitute consideration for numerous reasons.

First of all, neither the PSA nor its purported extension obligated Aime to apply for or obtain EFINs. Rather, EFINs were a prerequisite for Aime to exercise his repurchase opinion, which he was not obligated to exercise. J.A. 704. Under Virginia law, "if it appears that one party was never bound on its part to do the acts which form the consideration for the promise of the other, there is a lack of mutuality of obligation and the other party is not bound." *Busman* v. *Beeren & Barry Invs., LLC*, 69 Va. Cir. 375, 378 (2005) (alteration and internal quotation marks omitted); *see also C.G. Blake Co.* v. *W.R. Smith & Son, Ltd.*, 133 S.E. 685, 688 (Va. 1926) (explaining that "mutuality of obligation means that a contract must be binding on both parties so that an action may be maintained by one against the other"). For example, courts have held that a deposit that is applied toward the purchase price and refundable at the offeree's behest is not consideration for an option. *McLamb* v. *T.P. Inc.*, 619 S.E.2d 577, 581-582 (N.C. Ct. App. 2005) (citing cases). Because Aime was under no obligation to exercise his option, he was free to apply for an EFIN or not. He was "never bound" to continue pursue an EFIN, therefore his actions were not consideration sufficient to create a binding contract. *Busman*, 69 Va. Cir. at 378; *see also ESCgov*, 2014 WL 3891660, at *5-6 (concluding that the

31

promisee's statements consisted of "intentions and wishes but not of its binding promise").

In a similar vein, effort expended to exercise an option is not consideration. For example, an offeree's efforts to obtain financing to exercise an option do not constitute consideration for the option. *See McLellan* v. *Charly*, 758 N.W.2d 94, 106-107 (Wis. Ct. App. 2008). A property owner is not required to keep an offer open because a prospective buyer meets with a mortgage broker. *Id.* In the same way, Liberty's extension offer did not become an obligation to keep Aime's option open merely because Aime was working with the IRS to obtain his EFIN. Were it otherwise, many revocable offers would be transformed into binding option contracts because it is usually the case that to exercise an option, the offeree must exert some effort.

In addition, extensions typically require new consideration. *See Cummins*, 48 S.E. at 893 ("[A]n extension of . . . [the time to perform a] written agreement may be shown when supported by some new and sufficient consideration."). A promise to undertake some action that a party is already obligated to perform is not legally sufficient consideration. *See Albright* v. *Burke & Herbert Bank & Tr. Co.*, 457 S.E.2d 776, 778 (Va. 1995) ("A debtor's promise to pay sums already due is not sufficient consideration to support a creditor's agreement to refinance the loan."). The PSA already contemplated that Aime (if he wished to exercise the repurchase option) would make efforts to secure

32

an EFIN. J.A. 704. Even if Aime had an obligation to obtain an EFIN, Hewitt merely offered him more time to do what he had already promised to do. Aime's continued efforts to fulfill his preexisting promise could not supply the necessary new consideration. *See, e.g.*, *Dollar Rent A Car Sys., Inc.* v. *P.R.P. Enters., Inc.*, No. 01-cv-698, 2006 WL 1266515, at *25 (N.D. Okla. May 8, 2006) (holding that offer lacked consideration and was non-binding when offeror "merely offered to allow Defendants additional time to do what they were already obligated to do").

Finally, according to the evidence at trial, Hewitt was told that Aime had already completed his work to restore the EFINs, so Hewitt could not have bargained for Aime's continued effort. Fletcher testified that she told Hewitt that Aime had submitted his materials to the IRS, which "confirmed they were just waiting for the appropriate paperwork from the courts of New York." J.A. 436. In her words, "everything was ready to go." *Id.* Consideration is about bargained-for expectations, and Hewitt could not have bargained for efforts by Aime that he believed had already occurred.

### b. *Aime's Assistance Through The 2016 Tax Season*

Aime also suggested in the district court that "staying involved with and assisting Liberty through the height of the 2016 tax season" could be consideration for the extension. Dkt. 108 at 21. That is wrong for two reasons.

33

First, Liberty forbade Aime from assisting with franchise operations while his EFINs were suspended.  J.A. 325; *see generally* I.R.S. Pub. 3112 at 27-31 (rev. Apr. 2017).  Per the PSA, Liberty assumed all responsibility for the operation of the franchises, J.A. 703, and then promptly "banned [Aime] from entering the Business," J.A. 864.  Aime's assistance with operating the business therefore was not, and could not, even implicitly be expected.

Second, Aime's assistance would not have been new consideration in any event.  The EFIN deadline in the PSA was May 8, after the tax season had ended and the franchises had entered off-season operations.  *See* J.A. 715 ("The term 'Tax Season' means the time period January 2 – April 30."); J.A. 341-342 (Jean-Louis testifying that April 20 "ended our tax season").  Any promise by Aime to "stay involved" through "the 2016 tax season" could not have been consideration for a new promise to extend the EFIN deadline past May 8 when, by then, the season had ended.

### c.    *Aime's Payment Of Rent And Expenses*

Aime's suggestion that Hewitt offered to extend the option deadline in exchange for Aime's implicit agreement to pay rent and other expenses associated with the franchises also falls short.  Aime's leases and utility contracts for the franchises were his own obligations, independent from Liberty, J.A. 425, and the PSA specifically granted Aime a right to be reimbursed for payments on those contracts through the duration of the option period, J.A. 703.

34

To the extent that Aime argues that Liberty did not reimburse him, that claim is not a matter of consideration but of breach of contract. Indeed, Aime countersued Liberty for failure to reimburse—clear evidence that he did not consider himself obligated to make such payments without reimbursement. *See* J.A. 86. Because Liberty was obligated to reimburse those payments, Aime did not confer any benefit on Liberty by paying rent and other expenses.

Furthermore, in paying the rent and utility contracts in his name, Aime would not have been promising to do anything he was not already obligated to do in light of his contracts with the lessors and other third parties. Those preexisting obligations could not serve as consideration for a new agreement. *See ESCgov*, 2014 WL 3891660, at *6; *Seward* v. *N.Y. Life Ins.*, 152 S.E. 346, 350 (Va. 1930). The PSA granted Aime a right to reimbursement, not relief from his contractual obligations to third parties. J.A. 703. The fact that he continued paying those obligations could not be new consideration to support an extension of the repurchase option, especially when Liberty received no benefit in return.

### 3.    *The Repurchase Option And Extension Were Illusory*

Another, independent reason Aime cannot enforce the option extension is that the option and the extension were illusory. When a party's performance is contingent "upon [its] approval of the transaction[]," that party's promise is

of an "illusory or optional nature" and, as a result, the agreement lacks consideration. *Wexford Bancorp, LLC* v. *Concept 1, LLC*, 66 Va. Cir. 72, 72-73 (2004). The Virginia Supreme Court recognized this principle at least as early as *Cady* v. *Straus*, 34 S.E. 615 (Va. 1899). The agreement in *Cady* was qualified with the caveat that "[t]his agreement . . . is subject to our clients' approval, but we believe they will promptly carry it out." *Id.* at 616. The court held that this was a "mere offer to submit a proposition to their clients," but the agents "did not undertake to bind their principals by their agreement." *Id.* at 617. As a result, the contract lacked "[m]utuality of obligation," which "is of the essence of a contract." *Id.*

The PSA did not obligate Liberty to sell the franchises back to Aime after he received his EFINs. Instead, it provided that Aime would "have the option to buy back the business . . . pursuant to a separate purchase and sale agreement between the parties *and subject to [Liberty's] standard sales and approval process*." J.A. 704 (emphasis added). At trial, Angela Ianni testified that Liberty's standard sales and process requires all franchise sales to be "approved by the regional director, the VP of operations, the CFO and [the] CEO." J.A. 193.[5] Like the situation in *Wexford*, Liberty's performance (i.e.

---

[5] The district court's evidentiary ruling prevented Liberty from developing the facts about its sales and approval process further. To the extent the illusory or optional nature of Liberty's promise is not plain from the trial record, it is the prejudicial result of the court's erroneous ruling. *See* pp. 45-51, *infra*.

selling the franchises back to Aime) was contingent upon the approval of, among others, its CEO, John Hewitt. And as explained, Hewitt had previously exercised that authority when he rejected Jean-Louis's application to purchase the franchises. J.A. 355, 436. Because Liberty was not bound to perform, its promise was illusory and the repurchase option lacked consideration.

"If the condition precedent is within the control of one of the parties, then it renders any agreement illusory." *iCore Networks, Inc.* v. *Alliance, Inc.*, No. 12-cv-535, 2012 WL 3071141, at *4 (E.D. Va. July 26, 2012). In *iCore*, the district court reasoned that if the defendant "had no obligation to use [the plaintiff's] services unless it decided to use [the plaintiff's] services," then "the entire contract [is] an illusory promise." *Id.* Here, Aime's ability to repurchase his franchises was subject to Liberty's approval; that approval was a condition precedent within Liberty's control. Liberty had no obligation to approve Aime's new franchise application, even if Aime obtained valid EFINs. Liberty's side of the repurchase deal was therefore illusory and unsupported by consideration.

### C.   The Repurchase Option Extension Was Not In Writing As Required By Virginia's Statute Of Frauds

The district court's conclusion that the parties entered into an oral contract to extend the repurchase option in the PSA was incorrect for the additional, independent reason that any such contract was required to be in writing under Virginia law. The court erred in holding that the statute of frauds did

37

not apply and in holding that Aime had established equitable estoppel to prevent application of the statute of frauds here.

### 1. Modifications Of Contracts Covered By The Statute Of Frauds Must Be In Writing

Virginia has codified its statute of frauds, which requires certain contracts to be "in writing and signed by the party to be charged or his agent," at Code Section 11-2. *See* Va. Code Ann. § 11-2. Under Virginia law, when the statute of frauds requires a contract to be in writing, "any modification to that contract must also be in writing and signed by the party to be charged or his agent." *Lindsay* v. *McEnearney Assocs., Inc.*, 531 S.E.2d 573, 575-576 (Va. 2000). Oral changes to contracts covered by the statute of frauds "would permit the very mischiefs which the statute meant to prevent." *Id.* at 575 (internal quotation marks omitted). Thus, in order to protect "contracts of so important a nature . . . from the imperfection of memory and the honest mistakes of witnesses," oral changes to a contract required to be in writing are invalid. *Id.* (internal quotation marks omitted).

Virginia courts and federal courts applying Virginia law have regularly applied this principle to reject oral modifications to and waivers of written contracts originally covered by the statute of frauds. *See, e.g.*, *Land & Marine Remediation, Inc.* v. *BASF Corp.*, No. 11-cv-239, 2012 WL 2415552, at *4-5 (E.D. Va. June 26, 2012) ("If . . . the Statute of Frauds requires a writing, then any subsequent modification of such contract must likewise be in writing.");

38

*Sun Hotel, Inc.* v. *SummitBridge Credit Invs. III, LLC*, 86 Va. Cir. 189, 199 (2013) ("[H]ere the Guarantees were required to be in writing pursuant to the Statute of Frauds.  Therefore, they may not be modified or waived orally.").

The PSA was required to be in writing for at least two reasons.[6]  First, the PSA was an "agreement that is not to be performed within a year," Va. Code Ann. § 11-2(8), because it contained covenants not to compete with Liberty, solicit former clients or employees, or lease property to competitors for two years after execution of the PSA, *see* J.A. 705, 724-726.  A covenant not to compete for longer than one year is covered by the statute of frauds.  *See McKown* v. *N. Am. Dev.*, No. LS-2336-2, 1991 WL 834897, at *1, *4 (Va. Cir. Ct. Apr. 2, 1991) (holding that "subsequent oral agreements" to a contract containing a seven-year noncompete clause were barred by the statute of frauds).  Second, the PSA terminated the five-year franchise agreements.  J.A. 703.  Because of their length, those franchise agreements were required to be in writing.  *See* Va. Code Ann. § 11-2.  As a contract modifying other contracts that were required to be in writing, the PSA was also required to be in writing.  *See Lindsay*, 531 S.E.2d at 575-576.

Because the PSA was required to be in writing, "any modification" to the PSA was also required to "be in writing and signed by the party to be

---

[6] Liberty raised additional reasons in the district court, only two of which the court addressed in its decision.  *See* J.A. 872.

charged or his agent." *Id.* As a matter of law, the PSA could not be modified orally, as Aime claimed it was here. Because there was no written agreement signed by Hewitt to extend the PSA, no such obligation could be enforced.

### 2. *Aime Did Not Establish The Elements Of Equitable Estoppel*

The district court also held that Liberty was equitably estopped from invoking the statue of frauds because "Aime relied upon [Liberty's] verbal promise of an EFIN extension to his detriment." J.A. 872. The court did not explain what actions by Aime constituted reliance, whether that reliance was reasonable, or how Aime was injured by his reliance. The district court's unexplained holding was incorrect, and Aime did not carry his burden to prove the elements of equitable estoppel.

The doctrine of equitable estoppel applies to prevent the statute of frauds from being used as a sword to cause, rather than prevent, fraud. Thus, the doctrine will be applied to avoid enforcement of the statute of frauds when enforcement "would cause a fraud and a wrong to be perpetrated." *T.* v. *T.*, 224 S.E.2d 148, 151 (Va. 1976). Courts have recognized, however, that estoppel should not be applied so liberally as to "effectually repeal" the statute of frauds where there is no reason to believe that the statute is being misused. *Colonial Ford Truck Sales, Inc.* v. *Schneider*, 325 S.E.2d 91, 94 (Va. 1985); *Pierce* v. *Wells Fargo Bank*, 85 Va. Cir. 32, 37 (2012); *see also Cell-Crete Corp.* v. *Lexington Ins.*, No. 14-0503, 2015 WL 12644565, at *4 (C.D. Cal. Feb. 5, 2015) ("To

ensure that equitable estoppel doesn't swallow the statute of frauds, it is limited to cases where the plaintiff . . . so far alter[ed] his position as to incur an unjust and unconscientious injury." (internal quotation marks omitted)); *Johnson* v. *Allison*, No. 03-428, 2004 WL 2266796, at *8 (Tenn. Ct. App. Oct. 7, 2004) (holding that estoppel "should not be applied too liberally lest the exception swallow the rule").

A party asserting equitable estoppel therefore must prove the necessary elements of representation, reasonable reliance, a change of position, and detriment. *Gitter* v. *Cardiac & Thoracic Surgical Assocs., Ltd.*, 419 Fed. App. 365, 369 (4th Cir. 2011); *see T.*, 224 S.E.2d at 152. Estoppel requires proof "by clear, precise, and unequivocal evidence." *Boykins Narrow Fabrics Corp.* v. *Weldon Roofing & Sheet Metal, Inc.*, 266 S.E.2d 887, 890 (Va. 1980). Aime has not carried this heavy burden.

First, Aime could not show that he reasonably relied on Hewitt's offer to extend the deadline for the PSA repurchase option when the offer was conveyed to him secondhand, he doubted the offer, and Hewitt never assuaged his doubts or even confirmed the offer, despite Aime's requests for clarification. As previously explained, on April 28, Aime expressed significant doubts about whether Liberty would honor the offer. Aime had learned that Liberty had moved his staff to offices he did not intend to repurchase, a decision Aime feared meant Liberty no longer intended to extend his option. J.A. 736. As

41

Aime put it in an e-mail to Hewitt, "*I do not know the intentions of [Liberty]* to either take the stores back or to help [me] get the stores back." *Id.* (emphasis added). And Aime admitted that he was aware that "the company [area developer] is telling her [district manager] that I will not get the stores back and they are telling my prior staff the same." *Id.*

When a promisor's subsequent words and deeds contradict an earlier promise, reliance on that promise is not reasonable. *Cf. Datastaff Tech. Grp., Inc.* v. *Centex Constr. Co.*, 528 F. Supp. 2d 587, 596 (E.D. Va. 2007) (holding reliance unreasonable when defendants had drafted a document directly contradicting the prior representation); *Khoury* v. *Cmty. Mem'l Hosp., Inc.*, 123 S.E.2d 533, 538 (Va. 1962) (concluding that plaintiff's knowledge of circumstances that put the offer in doubt meant he "must be held to have acted at his own risk"). Here, not only did Liberty's subsequent actions give Aime reason to doubt the purported offer, but Aime contemporaneously *admitted* that he did not know Liberty's intentions.

Moreover, Aime never received a response from Hewitt concerning his requests for clarification. In both his April 20 and April 28 e-mails, Aime pressed Hewitt for additional information about an extension. In his second e-mail, Aime asked Hewitt directly whether he "would . . . like to switch leases over and handle a buyout or . . . extend [his] PSA and work things out with the buyback." J.A. 736. Hewitt did not respond with answers to either e-

42

mail.  J.A. 261.  He did not assuage Aime's doubts or clarify Liberty's intentions.  At bottom, Aime claims he relied on a promise he heard about only secondhand, that he explicitly doubted, that was contradicted by the promisor's actions, and that the promisor refused to acknowledge after Aime's multiple attempts to confirm.  That is not reasonable.

Second, Aime could not show that he changed position to his detriment to a degree warranting estoppel.  A quintessential case where equitable estoppel overcame the statute of frauds under Virginia law is *Nargi* v. *CaMac Corp.*, 820 F. Supp. 253 (W.D. Va. 1992).  There, a prospective employer orally offered the plaintiff a four-year job and to purchase his home so he could relocate.  The plaintiff sold his home, closed his business, and moved to a different State in reliance on that oral representation, and the court found detrimental reliance.  *Id.* at 257; *see also Meriweather Mowing Serv., Inc.* v. *St. Anne's-Belfield, Inc.*, 51 Va. Cir. 517, 522 (2000) (plaintiff purchased equipment and turned away prospective clients).

By contrast, courts have been unwilling to override the statute of frauds when a party's reliance is not as detrimental.  For example, in *Pierce*, 85 Va. Cir. 32, plaintiffs agreed to modify their mortgage to obtain a new, lower payment schedule.  When the bank ultimately did not give plaintiffs the previously offered interest rate and plaintiffs' home was sold at foreclosure, plaintiffs asserted estoppel.  The court rejected their argument that they detrimentally

43

relied by foregoing other opportunities to prevent foreclosure, because "[p]laintiffs stood in the same position as always, either paying under the terms of their Note or facing foreclosure for failure to pay their mortgage payments." *Id.* at 37; *see also Albanese* v. *WCI Cmtys., Inc.*, 530 F. Supp. 2d 752, 767 (E.D. Va. 2007) (rejecting estoppel because plaintiff's "level of reliance does not rise to the same level as the employee's reliance in *Nargi*" when there was not evidence that the employer's offer "lured" plaintiff to change position).

Aime cannot show that he "did something different from what [he] otherwise would have done and that doing so was costly." *Pierce*, 85 Va. Cir. at 37. As Fletcher testified, "everything was ready to go" for his EFIN extension application before Hewitt made his offer. J.A. 436. Regarding any expenses he incurred for the business after the offer, like the plaintiffs in *Pierce*, Aime "stood in the same position as always" because he was bound under third-party agreements and was entitled to reimbursement from Liberty. At best, Aime relied on a promise he explicitly doubted and experienced little, if any, impact from his reliance. Permitting Aime to evade the writing requirement "would create a cause of action based upon unilateral interpretations of discussions to modify existing contracts which must be in writing . . . effectively repeal[ing] the Virginia Statute of Frauds." *Pierce*, 85 Va. Cir. at 37.

## II. THE DISTRICT COURT ABUSED ITS DISCRETION BY EXCLUDING EVIDENCE ABOUT LIBERTY'S SALES AND APPROVAL PROCESS

At a minimum, the district court's judgment should be vacated and the case remanded for a new trial in light of the court's erroneous exclusion of important evidence at trial. The district court prevented Liberty from presenting testimony about the "sales and approval process" referenced in the PSA that Aime was required to satisfy before he could regain the franchises. The court excluded the evidence apparently as a sanction for failure to produce documents about the sales and approval process in discovery—despite Liberty's explanation, without contradiction, that it had found no documents about the sales and approval process and did not intend to introduce any such documents into evidence during the witness's testimony. The excluded testimony concerned a critical precondition of the repurchase option and ultimately led the district court to misunderstand the repurchase option, coloring the court's view of Liberty's conduct and the applicable damages.

A. The PSA gave Aime the option, if he obtained valid EFINs before May 8, 2016, to repurchase the franchises "pursuant to a separate purchase and sale agreement between the parties and subject to [Liberty's] standard sales and approval process." J.A. 704. At trial, Liberty sought to elicit testimony from its witness, Angela Ianni, about "what the sales and approval process entails." J.A. 221-222. This testimony was directly relevant to proving

45

the requirements that Aime would have had to satisfy to repurchase the franchises.

Aime's counsel objected, citing his motion *in limine* to exclude "all evidence, testimony or argument that Aime or Wolf could not have satisfied Liberty Tax's standard sales and approval process as described in paragraph 4 of the PSA." J.A. 99; *see* J.A. 222. Aime's counsel told the court that, during discovery, it had requested "documents describing this approval process," and Liberty had not produced any responsive documents. J.A. 222. In the motion *in limine*, Aime requested exclusion of evidence about the process as a discovery sanction, citing Federal Rule of Civil Procedure 37(c). *See* J.A. 112.

In response, Liberty's counsel explained to the district court that "there are no sales and approval documents," and Aime's counsel had elected not "to conduct a 30(b)(6) deposition of Liberty" at which he could have inquired about that undocumented internal process. J.A. 222. Liberty's counsel noted that "[t]his witness can testify . . . that there are no documents [describing the sales and approval process]. . . . If I had the documents, I would use them as exhibits." *Id.* After confirming that "[n]o documents were ever produced" in response to the discovery request, the district court sustained the objection without further analysis. J.A. 223.

46

B.    The district court abused its discretion in excluding testimony about the sales and approval process as an apparent sanction for failing to produce documents that do not exist. Rule 37(c)(1) permits a court to exclude information or a witness at trial if a party failed to provide that information or identify that witness as required by Rule 26(a) or (e) "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). This Court has instructed district courts to be guided by five factors in determining "whether a party's nondisclosure or untimely disclosure of evidence is substantially justified or harmless." *Bresler* v. *Wilmington Tr. Co.*, 855 F.3d 178, 190 (4th Cir. 2017), *petition for cert. filed*, 86 U.S.L.W. 3082 (U.S. Aug. 14, 2017) (No. 17-248). Those factors are: (1) the surprise to the party against whom the evidence is offered; (2) the ability to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the offering party's explanation for its failure to disclose. *Id.* (citing *S. States Rack & Fixture, Inc.* v. *Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003)).

The district court here did not assess any of these five factors or the applicability of Rule 37(c)(1) more generally. For the district court, it was enough that "[n]o documents were ever produced" about the sales and approval process, despite the fact that the witness was proffered to testify about the process without reference to any documents. J.A. 223. But, plainly, the

Rule 37(c)(1) sanction was unavailable here. Liberty did not "fail[] to provide information . . . required by Rule 26(a) or (e)" regarding the sales and approval process, Fed. R. Civ. P. 37(c)(1), because it had no such documents to produce. *See Middle E. Broad. Networks, Inc.* v. *MBI Glob., LLC*, 689 Fed. App. 155, 160 (4th Cir. 2017) (concluding that party did not plainly violate Rule 26 when it "claim[s] no documents exist" regarding the relevant issue). There was no "failure" to produce, but even if there were, it was "substantially justified" by the fact that Liberty had no responsive documents to produce and was "harmless" because Liberty did not intend to use any documents about the process at trial.

Importantly, there was no contention at trial that Liberty had documents to produce about the sales and approval process.[7] As Liberty told the district court, the witness whose testimony it sought to admit could testify "that there are no documents." J.A. 222. Aime did not argue that there was any reason to believe that such documents existed but had not been produced. If anything, the limited evidence about the sales and approval process that was introduced at trial corroborated the lack of documentation. Earlier in her testimony, Ianni testified that "[t]he approval process" includes approval of an

---

[7] During discovery, Aime filed a motion to compel a response to his requests for production of documents regarding the sales and approval process, *see* Dkt. 73, but the district court did not grant that part of the motion, *see* J.A. 137-139.

applicant "by the regional director, the VP of operations, the CFO and our CEO." J.A. 193. Regarding Jean-Louis's franchise application, Fletcher testified that Liberty CEO Hewitt had withheld his approval because certain individuals at Liberty were "not comfortable selling to [Jean-Louis]" due to his attitude. J.A. 355, 436. That evidence illustrates that the approval process consists of case-specific assessments conveyed between colleagues. The district court had no basis for believing that responsive documents existed and had been withheld.

Furthermore, the district court's exclusion of the testimony contravened this Court's longstanding guidance that, in a nonjury trial, "to exclude that which is competent and relevant by mechanistic application of an exclusionary rule is exceedingly dangerous to the . . . trial process and may well result in vacating the judgment." *Multi-Med. Convalescent & Nursing Ctr. of Towson v. NLRB*, 550 F.2d 974, 977 (4th Cir. 1977). As the Court has explained, "[i]n a nonjury trial, . . . little harm can result from the reception of evidence that could perhaps be excluded," because the trial judge "is presumably competent to screen out and disregard what he thinks he should not have heard, or to discount it for practical and sensible reasons." *Id.* Rather than follow this Court's "if in doubt, let it in" standard of admissibility for bench trials, *id.* at 978, the district court erroneously excluded highly relevant evidence about a condition precedent to a central issue in the case, Aime's potential repurchase

49

of the franchises. In addition to erroneously excluding the evidence as a discovery sanction when no sanction was warranted, the district court arbitrarily limited its own knowledge of key facts in the case and hampered this Court's ability to review its findings and conclusions.

C.    Where, as here, a district court's erroneous exclusion of evidence "prevented [a party] from fully developing evidence relevant to a material issue," the error is not harmless. *Schultz* v. *Butcher*, 24 F.3d 626, 632 (4th Cir. 1994) (granting a new bench trial where the district court improperly excluded evidence). The correct interpretation of the PSA repurchase option paragraph and Aime's ability to repurchase his franchises pursuant to the PSA were material issues at trial for purposes of determining the parties' liability and damages. Liberty's sales and approval process, to which Aime's repurchase option was subject, was critical to the correct determination of those issues.

In its findings and conclusions, the district court erroneously rejected Liberty's argument that "it had no obligation to sell back all of the franchises" to Aime, concluding that Liberty's argument showed it "did not respect or recognize Defendants' *right to repurchase* the Business." J.A. 869 (emphasis added). And in calculating damages, the district court "assume[d]" that Aime would have repurchased the franchises, without taking into account whether Liberty would have approved his new application. J.A. 873. In both instances, the district court entirely failed to account for the fact that Aime's ability to

50

repurchase the franchises was "subject to [Liberty's] standard sales and approval process." J.A. 704. The court's rulings were irreparably tainted by its exclusion of relevant testimony about what the approval process entails and whether Aime would have satisfied it.

Had Liberty been permitted to develop this evidence at trial, it would have shown that Aime did not have a "right to repurchase" the franchises under the PSA because, even after obtaining a valid EFIN, he would have had to satisfy Liberty's sales and approval process, which included the discretionary approval of multiple Liberty officers. *See* J.A. 193. Further, testimony that the approval process did not *obligate* Liberty to approve Aime's repurchase application would have been highly relevant to determining whether the repurchase option was illusory. *See* pp. 35-37, *supra*. The district court's erroneous exclusion of testimony about the sales and approval process very likely contributed to its erroneous conclusions and interpretation of the PSA; it certainly could not be considered harmless.

51

## CONCLUSION

The district court's judgment should be vacated and the case remanded for further proceedings.

Respectfully submitted.

<u>/s/Allison J. Rushing</u>
ALLISON J. RUSHING
BRADLEY D. MASTERS
WILLIAMS & CONNOLLY LLP
  *725 Twelfth Street, N.W.*
  *Washington, DC 20005*
  *(202) 434-5000*
  *arushing@wc.com*

SEPTEMBER 25, 2017

52

## STATEMENT REGARDING ORAL ARGUMENT

Appellants respectfully submit that, given the complexity of the issues presented, oral argument would be helpful to the disposition of this appeal. *See* 4th Cir. Local Rule 34(a).

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Allison J. Rushing, counsel for appellants and a member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B), that the attached Brief of Plaintiffs-Appellants is proportionately spaced, has a typeface of 14 points or more, and contains 12,350 words.

/s/Allison J. Rushing
ALLISON J. RUSHING

SEPTEMBER 25, 2017

## CERTIFICATE OF SERVICE

I, Allison J. Rushing, counsel for appellants and a member of the Bar of this Court, certify that, on September 25, 2017, a copy of the attached Brief of Plaintiffs-Appellants was filed with the Clerk and served on the parties through the Court's electronic filing system. I further certify that all parties required to be served have been served.

/s/Allison J. Rushing
ALLISON J. RUSHING

SEPTEMBER 25, 2017